NOT DESIGNATED FOR PUBLICATION

No. 120,407

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ERIC LEE EITEL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed August 21, 2020.
Appeal dismissed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for
appellee.

Before ARNOLD-BURGER, C.J., STANDRIDGE and POWELL, JJ.

PER CURIAM:  Eric Lee Eitel appeals from the district court's decision finding none
of the *State v. Ortiz*, 230 Kan. 733, 640 P.2d 1255 (1982), exceptions to the requirement
of filing a timely notice of direct appeal applied to this case. For the reasons stated below,
we dismiss Eitel's untimely appeal for lack of jurisdiction.

FACTS

On October 30, 2017, Eitel was charged with four off-grid felonies: two counts of rape of a child under the age of 14, one count of aggravated criminal sodomy with a child under the age of 14, and one count of aggravated indecent liberties with a child under the age of 14 for acts that occurred between January 1, 2009, and May 30, 2010. On October 27, 2017, the district court appointed public defender Stacy Donovan to represent Eitel as lead counsel. On January 16, 2018, another public defender, Sonya Strickland, entered an appearance on Eitel's behalf as cocounsel to Donovan.

On March 26, 2018, Eitel entered into a plea agreement with the State. In exchange for Eitel's guilty plea, the State agreed to amend the charges to one count of rape, a severity level 1 felony, and two counts of aggravated indecent liberties with a child, severity level 3 felonies. The State also agreed to dismiss the remaining charge. Eitel pled guilty to the amended charges at a plea hearing held later that day. The district court engaged in a lengthy colloquy with Eitel, informing him, among other things, of the rights he was waiving by entering a plea and of his limited appeal rights. The district court asked Eitel if he had enough time to consider his plea, if his attorney discussed the plea with him, if he understood those discussions with his attorney, and whether he was satisfied with his attorney's services. Eitel responded affirmatively to each question. After finding that Eitel knowingly and voluntarily wanted to plead guilty to the amended charges, the district court accepted his guilty pleas and dismissed the remaining count.

On May 9, 2018, the district court sentenced Eitel to 273 months' imprisonment for all three amended counts. In imposing this sentence, the district court advised Eitel of his rights, specifically of his right to appeal. Regarding these rights, the district court judge stated:

"I would advise you that you do have a right to appeal these convictions and sentences. If you can't afford an attorney, one could be appointed for you. If you can't afford the filing fee, you could file what's call a Poverty Affidavit. But all of that would have to be done within 14 days of today's date."

Eitel stated on the record that he understood these rights. He did not file a notice of appeal within 14 days of the sentencing hearing.

On September 20, 2018, Eitel filed an untimely pro se notice of appeal. Our motions panel issued an order requiring the parties to show cause why Eitel's untimely appeal should not be dismissed for lack of jurisdiction. In his response, Eitel asked this court to either retain the matter for consideration or remand it for a hearing under *Ortiz*, 230 Kan. 733, Syl. ¶ 3, which provides for an otherwise untimely appeal if a defendant (1) was not informed of his or her right to appeal, (2) was not furnished an attorney to perfect an appeal, or (3) was furnished an attorney for that purpose who failed to perfect and complete an appeal. Specifically, he argued that this court should accept his notice of appeal pursuant to the third *Ortiz* exception: Eitel had an attorney, but his attorney failed to timely perfect an appeal. The motions panel ultimately remanded the matter to the district court so it could determine if any *Ortiz* exception applied.

The district court held an evidentiary hearing on March 18, 2019. Eitel was the first witness to testify. He said he wanted to withdraw his original plea agreement because he felt pressured into taking it and because he was "scared out of [his] wits" to the point that he did not know what he could or could not do. He noted that he did not have the opportunity to thoroughly read through the plea agreement, that his attorneys did not go over the plea agreement with him in detail, that he was given approximately 10 to 12 minutes to consider the plea deal, and that his attorneys told him that the State would revoke the plea if he did not accept it right then. Notwithstanding these assertions, Eitel testified that he understood the terms of his plea, that he never told the district court he

was dissatisfied with the plea, and that he voluntarily signed the agreement, albeit reluctantly.

Eitel testified that both Donovan and Strickland visited him a couple days before sentencing to discuss the presentence investigation report. Eitel told them at this visit that he wanted to withdraw his plea and negotiate a lower sentence. Donovan advised Eitel that the plea could not be withdrawn unless he fired them, and Eitel would have to go before the judge to do that. Eitel responded by telling them that they were fired, but Donovan advised him to think about it some more and they would visit with him again before sentencing.

According to Eitel, on the day of sentencing, he again told his attorneys he wanted to withdraw his plea because he was uncomfortable with it. Donovan told Eitel that he could either go forward with the plea or receive 25 years to life in prison. Eitel said he decided to go forward with the plea and sentencing but he knew "right away" that he wanted to appeal. He visited with his father at the jail after the sentencing hearing and told his father to contact Donovan to tell her he wanted to appeal. Eitel testified that his father called Donovan every day or every other day after the May 9, 2018 sentencing hearing but his father was not able to contact Donovan until late July 2018, which is when she told Eitel's father that no appeal had ever been filed. Eitel also testified that—three or four days after the sentencing hearing—he asked a jail guard to contact his attorneys. Eitel said this was the only process he knew of in the jail to request to see his attorneys and, as far as he knew, the guard followed through on the request. Eitel also said he tried calling his attorneys one time about five or six days after the sentencing hearing and told an assistant that he wanted his attorneys to come see him as soon as possible. His attorneys' assistant came to see him eight to nine days after the May 9, 2018 sentencing, and he told her he wanted to appeal. The assistant informed him, however, that he could not file an appeal because he took a plea. The assistant also said Donovan was busy and could not come see him.

Eitel said he drafted a pro se notice of appeal between May 20 and May 30, 2018. He paid five dollars out of his account on May 30 to pay for the notary fees. He asserted he was given bad advice on where to send the notice and ended up sending it to the appellate defender's office instead of sending it to the district court clerk. He discovered this error in late July after his father contacted his attorney, who reported that no appeal had ever been filed. He immediately got to work drafting another notice of appeal. However, Eitel did not get the new notice of appeal filed until two months later, on September 20, 2018.

When asked if he was ever advised of his right to appeal, Eitel testified that Donovan did not tell him anything before sentencing about his right to appeal. On cross-examination, however, he conceded that the district court expressly advised him of his right to appeal both at the plea hearing and at the sentencing hearing. Eitel agreed that the district court advised him of all of his rights at the plea hearing, including the right to appeal, and that in response he told the court he understood his rights, he voluntarily waived those rights, and he chose to enter the plea anyway. The transcript of the plea hearing reflects the following colloquy between the court and Eitel:

> "THE COURT:  . . . There is another right that you do not lose completely by entering a plea, but I would tell you it is much more limited if you enter a plea than it would be if you had a full-blown trial, and that is the right to appeal to a higher court if you believe there are errors or mistakes at this district-court level. Like I said, that right you don't lose completely, but it becomes more limited. You don't have trial errors to complain about or to raise before an appellate court. So do you understand that there—that there would be limitations to that right to appeal?
> "THE DEFENDANT:  Yes, ma'am."

The transcript from sentencing also reflects that the court expressly advised Eitel of his right to appeal. Eitel agreed that he never submitted a written request for his attorneys to

file an appeal or a written request for either one of them to come see him after sentencing for any reason, let alone to discuss appealing.

Donovan testified next. She said Eitel was on board with taking a plea bargain and authorized her to approach the State about entering a deal. Just before the plea hearing on March 26, 2018, she met with Eitel to discuss the plea agreement with him in detail; she told him he did not have to take it that day. Specifically, she communicated that he might want to take some time to think about the offer and emphasized that there was no rush for him to take it. Eitel told her that he wanted to "get it over with" and go through with the plea. Donovan testified she never told Eitel that he only had 10 to 15 minutes to consider the plea and she never told Eitel that the plea would go away if he asked for additional time to consider it.

Regarding the plea agreement, Donovan said she did not have him sign an acknowledgment of rights form after reviewing the plea agreement together but she verbally advised him of all the rights he would be giving up by entering a plea. Specifically, she told Eitel about his rights to a jury trial, to call witnesses, to testify on his own behalf, and to appeal. She informed him about his limited rights to appeal since he was entering into a plea agreement.

When Donovan met with Eitel the morning of sentencing, he told her he wanted to discuss withdrawing his plea agreement. She said she went over the advantages and disadvantages of withdrawing his plea and the ways in which he could withdraw his plea; he ultimately decided he wanted to keep the plea agreement in place and move forward with sentencing. She also discussed with him his limited appeal rights and told him there likely would not be any issues to appeal if he received the benefits of the plea agreement. Donovan testified that Eitel never told her that he wanted her to move forward with filing a motion to withdraw the plea or that she was fired.

While she said it usually was her practice to have clients sign an appeal rights waiver after sentencing, she did not do so in this case because they had discussed the matter before sentencing and Eitel wanted to move forward with sentencing. Donovan said she wrote "no appeal" in her attorney notes to reflect the fact that she discussed with Eitel that there were no issues to appeal. Donovan admitted she did not visit Eitel after sentencing. But she said Eitel never asked her to file a notice of appeal. Contrary to Eitel's testimony, she never received any notice of a phone call or written communication from Eitel after sentencing requesting that she come see him or file a notice of appeal. Also contrary to Eitel's testimony, Donovan said she had no knowledge of her assistant visiting Eitel after sentencing. She said her assistant's usual practice would be to e-mail Donovan if she visited with a client and she did not receive an e-mail. Eitel did not call the assistant as a witness at the evidentiary hearing. Donovan said the first time she heard anything about Eitel wanting to appeal was on July 19, 2018, when Eitel's father called her to ask how the appeal was going. Donovan told him there was no appeal. Eitel's father told her that Eitel told another inmate to contact Donovan about an appeal. Donovan advised the father that she was never contacted and this was the first time she heard about Eitel's desire to appeal. Aside from this call, Donovan said she received no other communication from Eitel or anyone regarding filing a notice of appeal.

Strickland, Donovan's cocounsel, also testified. While she largely confirmed Donovan's testimony, Strickland provided additional details about going over the plea agreement with Eitel and informing him of his right to appeal. With regard to the plea agreement, she testified Eitel expressed an interest in withdrawing his plea before sentencing. Strickland reiterated that she and Donovan discussed the advantages and disadvantages of withdrawing a plea and the options to do so. She indicated that they gave Eitel some time to think about what he wanted to do and then tell them how he wanted to proceed before sentencing. Like Donovan, Strickland did not recall Eitel telling them he wanted to fire them so he could proceed with filing a motion to withdraw his plea.

With regard to the right to appeal, Strickland testified that she and Donovan discussed Eitel's appeal rights with him in detail before he entered the plea deal. Specifically, they informed him about the impact a plea deal has on an appeal and what issues he would be allowed to appeal. Strickland said Eitel never told her that he wanted to appeal. She never received any phone calls or messages from Eitel after sentencing. She never received any written communications from Eitel after sentencing requesting that she come see him or that she file a notice of appeal. She added that Eitel also never sent them a "kite"—messages that inmates in the jail are able to fill out for free to send to their attorneys and that the public defender's office pick up from the jail every business day—to ask them to file an appeal. Strickland noted that before the sentencing hearing, Eitel had sent them numerous kites when he wanted to see them. Like Donovan, and contrary to Eitel's testimony, Strickland said she had no knowledge of Donovan's assistant visiting Eitel after sentencing. She testified that the first and only time she had heard that Eitel wanted to appeal was when Eitel's father contacted Donovan.

In closing arguments, Eitel's counsel confirmed that Eitel sought relief under the third *Ortiz* exception: that he had counsel for the purposes of perfecting an appeal, but counsel failed to timely do so. The State argued that Eitel never expressed his desire to appeal to either of his trial counsel; specifically, he knew how to directly contact his attorneys but chose not to do so. After considering the evidence and arguments presented, the district court found that none of the *Ortiz* exceptions applied in Eitel's case. The parties agreed that the first two *Ortiz* exceptions were not at issue as Eitel was fully informed of his appeal rights and he had counsel to help him file an appeal. And the court ruled that the third exception also did not apply because Eitel failed to present evidence showing that he directly contacted his attorneys to make known his desire to appeal. The court noted that Eitel's failure to send any form of written communication to his attorneys to express his appeal wishes proved fatal because his trial counsel could not perfect an appeal if they did not have direct knowledge that he wanted one.

ANALYSIS

An appellate court uses a dual standard to review a district court's decision on whether an exception under *Ortiz* applies to allow an otherwise untimely appeal. First, the appellate court reviews the facts underlying the district court's ruling for substantial competent evidence. The appellate court then reviews de novo the legal conclusion made by the district court on those facts as to whether the exception applies. *State v. Smith*, 303 Kan. 673, 677, 366 P.3d 226 (2016).

The third *Ortiz* exception may apply where a defendant had counsel but failed to timely perfect an appeal. Analysis of this exception includes consideration of the effectiveness of counsel, including whether counsel misinformed the client of the existence of appealable issues. See *State v. Shelly*, 303 Kan. 1027, 1051, 371 P.3d 820 (2016). Eitel and the State incorrectly rely on the ineffective assistance of counsel rule set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to assess the third *Ortiz* exception on appeal. As noted in *State v. Patton*, 287 Kan. 200, 223-24, 195 P.3d 753 (2008), however, the standard of performance to be applied to measure counsel's adequacy under the third *Ortiz* exception is found in *Roe v. Flores-Ortega*, 528 U.S. 470, 470-72, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000). Therefore, we reject the State's argument that ineffective assistance counsel claims may not be raised for the first time on appeal. That rule applies only in cases employing the *Strickland* framework, not in cases assessing counsel's performance under the third *Ortiz* exception. See *Patton*, 287 Kan. at 223-24. We must consider whether Eitel's counsel's performance was deficient under the *Flores-Ortega* standard as it implicates Eitel's Sixth Amendment right of counsel and effectiveness of counsel. *Patton*, 287 Kan. at 218-19.

There is a multistep analysis under the *Flores-Ortega* framework. In cases where a defendant neither instructs counsel to file an appeal nor asks that an appeal *not* be taken, the first question is whether counsel in fact consulted with the defendant about an appeal.

In consulting with a defendant, counsel must advise him or her about the advantages and disadvantages of taking an appeal and make a reasonable effort to discover the defendant's wishes. If counsel consulted with a defendant and failed to follow defendant's express instructions to file an appeal, then counsel performed in a professionally unreasonable manner. If the answer to the first question is no, counsel did not consult with the defendant, the court must ask a second question: Does counsel's failure to consult constitute deficient performance? Counsel has a constitutionally imposed duty to consult with a defendant about an appeal when there is reason to think either: (a) that a rational defendant would want to appeal or (b) that this particular defendant reasonably demonstrated to counsel that he or she was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. In cases where a defendant pleads guilty, the court must consider factors like whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal. *Shelly*, 303 Kan. at 1041-42 (quoting *Flores-Ortega*, 528 U.S. at 477-80).

We begin with the first question in the *Flores-Ortega* analysis. While both Donovan and Strickland testified that they fully informed Eitel of his appeal rights, there is no indication that they discussed with him the advantages and disadvantages of appealing. Rather, they both said they told Eitel what issues he would be allowed to appeal but that there likely were no issues to appeal. They also conceded that while it is their usual practice to obtain a written waiver of appeal rights to document the fact that a particular defendant does not want to appeal, they did not do so in this case. Rather, Donovan simply wrote "no appeal" in her notes after having met with Eitel before sentencing. Donovan testified that this merely signaled to her that she told Eitel there were no issues to appeal. Simply telling a defendant that a plea agreement leaves nothing

10

to appeal does not qualify as proper consultation. See *Shelly*, 303 Kan. at 1048. The fact that the attorneys did not have Eitel sign a waiver of appeal rights, as is their usual practice, and the fact that both admitted they never went to visit him following sentencing, support a finding that neither attorney made reasonable efforts to consult with Eitel to determine whether he wanted to appeal.

Having determined that the answer to the first question in the *Flores-Ortega* analysis is no, we move on the second question: whether counsel's failure to consult constituted deficient performance. In his brief, Eitel argues his attorneys' failure to comply with K.A.R. 105-3-9(a)(3)—which requires appointed lawyers to obtain signed waivers of appeal from their clients—intrinsically demonstrates that counsel's failure to consult with him constituted deficient performance: "Had Mr. Eitel's counsel consulted him about a written waiver, district court counsel would have learned of his desire to appeal his sentence. There was simply no reason not to meet with Mr. Eitel to ensure compliance with K.A.R. 105-3-9(a)(3) in this case."

But the appellate courts have held that an attorney's failure to obtain a written waiver of appeal, despite the requirement in K.A.R. 105-3-9(a)(3), is not itself a sufficient legal basis to satisfy one of the *Ortiz* exceptions or to otherwise allow a defendant's untimely appeal. See *State v. Northern*, 304 Kan. 860, 865, 375 P.3d 363 (2016); *State v. Willingham*, 266 Kan. 98, 100, 967 P.2d 1079 (1998). The absence of a signed waiver may be considered as evidence in an *Ortiz* hearing. See *State v. Harp*, 283 Kan. 740, 747-48, 156 P.3d 1268 (2007) (absence of waiver circumstantial evidence defendant had not been informed of right to appeal). But under the *Flores-Ortega* analysis, counsel's failure to consult is only deficient if there was reason to think that an objectively rational defendant would want to appeal or if the defendant reasonably demonstrated to counsel that he or she was interested in appealing. See *Shelly*, 303 Kan. at 1041-42. Based on our review of the record, neither is true in this case.

11

First, Eitel has failed to establish that a rational defendant in his situation would have wanted to appeal. Eitel was charged with four off-grid felonies: two counts of rape of a child under 14 years of age, one count of aggravated criminal sodomy with a child under 14 years of age, and one count aggravated indecent liberties with a child under 14 years of age. See K.S.A. 21-3502(a)(2) and (c); K.S.A. 21-3504(a)(3) and (c); K.S.A. 21-3506(a)(1) and (c). If Eitel was convicted of committing all four of these off-grid felonies, Kansas statute required him to "be sentenced to a term of imprisonment for life with a mandatory minimum term of imprisonment of not less than 25 years" where, in the absence of limited circumstances, he would not be eligible for probation, modification, or reduction of sentence by the application of good time credits. See K.S.A. 21-4643(a)(1)(B)-(D), (c), and (d). If the court sentenced him to consecutive terms for each count, Eitel would be facing 100 years in prison before he would have the opportunity for parole.

On December 20, 2017, a grand jury indicted Eitel on all four charges. That same day, the State filed a Motion to Substitute the Indictment for the Complaint and to Proceed on the Indictment Alone. On January 8, 2018, Eitel authorized Donovan to enter into plea negotiations; specifically, Donovan was to extend an offer that Eitel was willing to plead guilty in exchange for either two to four years or three to five years in prison. Donovan told Eitel that the prosecutor would probably want 10 years. Although Donovan does not remember the specific range of punishment she offered to the prosecutor on Eitel's behalf, the prosecutor did not make any counteroffer before March 26, 2018. Although nothing was actually offered by either party, negotiations resumed at some point a few days before a status hearing set for March 26, 2018, and the parties were close to a deal. But the negotiations took a turn for the worse due to, what the attorneys called at the *Ortiz* hearing, an "intervening event." Although the timing is not clear, Eitel apparently mailed a letter to the mother of the child he repeatedly raped and sodomized. The child's mother submitted a copy of the letter to the prosecutor. So before the March 26 status hearing, the prosecutor proposed an agreement that was not nearly as favorable

as the agreement contemplated in on-going negotiations before March 26: Eitel would plead guilty to the off-grid charges set forth in counts 1 and 2 in exchange for dismissal of the other two charges. Donovan conveyed the offer to Eitel and came back to tell the prosecutor that Eitel would not plead to an off-grid offense. After further negotiation, the State agreed to amend the charges to one count of rape, an on-grid severity level 1 felony, and two counts of aggravated indecent liberties with a child, on-grid severity level 3 felonies. The State also agreed to dismiss the remaining charge. As a result of the plea agreement, Eitel was facing 273 months in prison, a little shy of 23 years, as opposed to 100 years had he not entered into the plea agreement.

Eitel received a generous bargained-for plea deal, he understood the terms and the risks, and he voluntarily entered into it. As the State also correctly notes, K.S.A. 2019 Supp. 22-3602(a) broadly prohibits Eitel from appealing his convictions after entering guilty pleas. Eitel would have only been able to appeal certain aspects of his sentence—of which he was already given the most favorable one in his situation—and beyond generally claiming that he wants to withdraw his plea, Eitel has not identified any appealable issues. Eitel told his counsel to engage in plea negotiations with the State. Counsel was able to secure a favorable plea deal, especially given Eitel's decision to mail a letter to the mother of the child he repeatedly raped and sodomized. Evidence presented at the *Ortiz* hearing showed that when counsel went over the plea agreement with Eitel, he told them that he did not want to take any additional time to think about it and that he wanted to get it over with. This is further supported by the transcript from the plea hearing, which shows Eitel knowingly and voluntarily entered the plea, stating he had time to think about it, that he went over everything with his counsel, that he was satisfied with counsel's services, and that he understood the terms. Given these facts, Eitel has failed to show any reason to think that an objectively rational defendant would want to appeal.

Eitel similarly has failed to show he reasonably demonstrated to counsel that he was interested in appealing. At sentencing, the district court imposed the sentence as outlined in the plea agreement. The court informed Eitel of his right to appeal. While Eitel testified that he knew "right away" after sentencing that he wanted to appeal, he admitted that after sentencing he did not tell counsel he wanted to appeal or ask counsel to come see him while he was being taken back to holding. He admitted that he never wrote to counsel after sentencing to request that they come see him or to request that they file an appeal on his behalf, despite testimony indicating that he knew how to utilize and had used the kite written messaging system to contact his attorneys previously. He testified that he called his attorneys' office once but both counsel denied getting any message or notice of his call. While he claimed that his attorneys' assistant came to see him at some point after sentencing and that he told her he wanted to appeal, neither of Eitel's attorneys received an e-mail or other notification that the assistant had done so, which is the office protocol when the assistant visits a client in jail. Notably, Eitel did not call the assistant as a witness at the hearing. Both his attorneys testified they received no phone calls or any other communication from Eitel or anyone else regarding his desire to appeal until July 19, 2018, when Eitel's father called Donovan to inquire about the status of an appeal. In sum, Eitel has failed to show he made a reasonable effort before, during, or after sentencing to contact counsel to ask them to withdraw his plea or to file a notice of appeal.

For the reasons stated above, we find counsel's performance in this case was not deficient under the *Flores-Ortega* framework. Because counsel's performance was not deficient, we affirm the district court's ruling on the *Ortiz* issue remanded to it for consideration by our order dated February 1, 2019. Because we retained jurisdiction over the underlying appeal pending the determination of the remanded issue, we dismiss Eitel's untimely appeal for lack of jurisdiction.

Appeal dismissed.